# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:18-cv-00180-FDW

| | |
|---|---|
| ASHTON FLETCHER BRANCH HARRIS, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>)<br>CLEVELAND F. RIDDLE, et al., )<br>)<br>Defendants. )<br>_____ ) | **ORDER** |

**THIS MATTER** comes before the Court on Motion for Summary Judgment by Defendants Riddle, Grindstaff, Harris, and Slater [Doc. 33] and on Plaintiff's Motion for Copies [Doc. 42].

## I. BACKGROUND

### A. Procedural Background

Pro se Plaintiff Ashton Fletcher Branch Harris ("Plaintiff"), a North Carolina inmate currently incarcerated at Alexander Correctional Institution in Taylorsville, North Carolina, filed this action on June 26, 2018, pursuant to 42 U.S.C. § 1983. Plaintiff named the following individuals as Defendants in this matter: (1) Cleveland F. Riddle, identified as a Lieutenant at Mountain View Correctional Institution ("Mountain View"); (2) Tommy Harris, identified as a correctional officer at Mountain View; (3) FNU Grindstaff, identified as a Captain at Mountain View; and (4) FNU Slater, identified as a psychologist at Mountain View. [Doc. 1 at 2-3]. Plaintiff alleges that, on April 19, 2018, Defendants used excessive force against Plaintiff, failed to intervene in the use of excessive, force, and subjected Plaintiff to cruel and unusual punishment

through his conditions of confinement, all in violation of Plaintiff's Eighth Amendment rights while he was incarcerated at Mountain View. [Doc. 1]. Plaintiff seeks compensatory and punitive damages. [Doc. 1 at 8]. The Plaintiff's complaint survived initial review under 28 U.S.C. § 1915(e)(2). [Doc. 10].

On July 9, 2019, Defendants filed the pending summary judgment motion. [Doc. 33]. This Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), granting Petitioner fourteen days to respond to the summary judgment motion. [See Docs. 36, 40]. Plaintiff timely filed his response to Defendants' motion. [See Doc. 41]. On November 14, 2019, Plaintiff filed a letter with the Court [Doc. 42], which the Court construes as a motion for copies of all documents filed in the docket in this matter and a request for a status update in this case.

**B.     Factual Background**

**1.     Defendants' Summary Judgment Materials**

In support of the summary judgment motion, Defendants rely on incident reports by various correctional officers and other witnesses submitted following the incident, Plaintiff's medical and mental health records, other prison records and policies, and the affidavits of Tommy Buchanan, Robert Mask, and Janet Ray and Defendants Grindstaff, Harris, Riddle and Slater. [See Docs.35-1 through 35-7]. Defendants' forecast of evidence shows the following:

Sometime on or around April 15, 2018, Plaintiff began a hunger strike to protest his lack of access to certain medications and mental health care. [Doc. 35-5 at 20]. In addition to the hunger strike, Plaintiff had engaged in self-injurious behavior ("SIB") and claimed that he was going to harm himself. [Doc. 35-7 at ¶ 8: Slater Affidavit]. As a result, Plaintiff was placed on SIB precautions by Dr. Nicole Prior, a psychologist, on April 18, 2018. [Id. at ¶ 8; Id. at 9]. At this time, the Mental Health standard operating procedures ("SOP") were employed in caring for

2

the Plaintiff. [Id. at ¶ 8]. Dr. Prior, in her note recommending SIB precautions, states:

> [Plaintiff] appears to be[ ] trying to manipulate the system and to gain treatment that he wants by claiming to be suicidal. He has done this several time[s] while being housed at [Alexander Correctional Institution] [i]n addition to going on hunger strikes. He has poor coping skills and difficulty with impulse control. Both he and another inmate appear to be mimicking each other in hopes of achieving their goal of being released from ICONN.

[Id. at 8].

The next day, April 19, 2018, Plaintiff remained on SIB precautions. [Id. at ¶ 9]. SIB precautions require that a custody officer must continuously monitor the inmate. To do so, the custody official must be able to see the inmate. That is, the inmate's body cannot be entirely covered. [Id.]. Under SIB precautions, an inmate must be seen by a psychology staff member every 24 hours. [Id. at ¶ 10]. Further, under Mental Health SOP, an inmate placed on SIB precautions is provided a safety blanket, safety smock, and safety mattress. All other materials are to be removed unless authorized by a mental health clinician. [Id. at 14].

Defendant Slater is a licensed psychology associate employed by the North Carolina Department of Public Safety (NCDPS) at Mountain View. [Id. at ¶ 3]. Defendant Slater has a bachelor's degree from Ohio University and a master's degree in clinical psychology. [Id. at ¶ 4]. Defendant Slater has been employed with the NCDPS as a psychologist for 19 years. [Id. at ¶ 5].

On the morning of April 19, 2018, at approximately 8:30 a.m., Defendant Slater went to the restricted housing unit (RHU) where Plaintiff was being housed for a 24-hour SIB check. [Id. at ¶ 11]. When Defendant Slater arrived at the RHU that morning, she was informed that Plaintiff was observed by custody staff covering his entire body with the safety blanket. [Id. at ¶ 12; Id. at 7; Doc. 35-6 at ¶ 5(d): Riddle Affidavit]. Plaintiff had been repeatedly told that he needed to uncover at least his head so that he could be observed as "safe" according to SIB precautions.

3

[Doc. 35-7 at ¶ 12; Id. at 7; see Doc. 35-6 at ¶ 5(d)]. Plaintiff refused to comply. [Id. at ¶ 12; Id. at 7]. Defendant Slater approached Plaintiff's cell with custodial staff and Plaintiff refused to respond to Defendant Slater. Plaintiff kept himself completely obscured. [Id. at ¶ 13; Id. at 7; see Doc. 35-6 at ¶ 5(d)]. Thereafter, Defendant Slater instructed the custodial staff to take way the safety blanket. Plaintiff complied, but then used the safety smock in the same manner as he had used the safety blanket. The smock was, therefore, also removed. [Id. at ¶ 15; Id. at 7; Doc. 35-6 at ¶ 5(e)-(h)]. Next, Plaintiff used his safety mattress in the same manner, preventing custodial staff from observing him. The safety mattress, therefore, was also removed for safety and security purposes for the proper observation of Plaintiff. [Id. at ¶¶ 16, 17; Id. at 7; Doc. 35-6 at ¶ 5(i)].

At approximately 9:20 a.m., Defendant Riddle decided to move Plaintiff from cell S-111 to S-109. [Doc. 35-6 at ¶ 5(j)]. Plaintiff was given a pair of boxer shorts for the transfer between these cells. [Id. at ¶ 5(l)]. At or around 12:00 p.m., Plaintiff refused an evaluation related to his hunger strike by Physicians Assistant Jeffrey Patane, including all interactions with mental health and medical care providers, all health screenings, and all medications. [Doc. 35-5 at 19].

At approximately 1:00 p.m., a radio call advised correctional staff that Plaintiff was repeatedly flushing the toilet in his cell. [Doc. 35-3 at ¶¶ 4-6: Harris Declaration]. At the time, Plaintiff was in cell S-109 and Defendant Harris and Assistant Unit Manager Robert Mask were in the prison intake area. They both went to Plaintiff's cell. [Id. at ¶¶ 4-6; Doc. 35-4 at ¶¶ 5(a)-(b)]. When they arrived, Mask looked through the window of the cell and saw that Plaintiff had his head in the toilet and was flushing it repeatedly. [Id. at ¶ 5(c)]. Mask knocked on Plaintiff's window. Plaintiff responded by looking up and then placing his head back into the toilet. [Id. at ¶ 5(d)]. Mask then instructed Defendant Harris to turn off the water to Plaintiff's cell, which he did. [Doc. 35-3 at ¶¶ 4-6; Doc. 35-4 at ¶ 5(e)]. After Plaintiff ceased flushing his own head in the

4

toilet, he began banging his head on the cell door, attempting to harm himself. [Doc. 35-2 at ¶ 5(d); Doc. 35-4 at ¶ 5(e)]. At this time, Plaintiff refused orders to stop banging his head on the cell door and to submit to handcuffs. [Id. at ¶ 5(e)-(f)]. Defendant Grindstaff arrived and ordered the Plaintiff to submit to handcuffs or Plaintiff would be pepper sprayed. [Id. at ¶ 5(g); Doc. 35-4 at ¶ 5(f)]. Plaintiff then submitted to handcuffs and was given a pair of boxer shorts to be escorted to an intake holding cell where he would be placed in four-point restraints for his own safety. [Id. at ¶ 5(h)-(i)]. The use of four-point restraints was approved by Lieutenant Tommy Buchanan, who was the officer in charge on the day of the incident. [Doc. 35-1 at 40; see id. at ¶ 5: Buchanan Affidavit].

At approximately 1:45 p.m., four-point restraints were applied to Plaintiff. [Id. at 40]. Defendant Harris, while other officers were restraining Plaintiff so that the restraints could be applied, placed a safety helmet on Plaintiff. Placement of a safety helmet is standard and customary in this situation. [Doc. 35-3 at ¶ 10]. The application of the restraints was without incident, other than Plaintiff using profanity toward the staff, calling them a bunch of "Hillbilly Mother Fuckers." [Doc. 35-6 at ¶ 5(u)]. Plaintiff also told the prison staff they were incompetent and tried to direct the staff on how to apply the restraints. [Id. at ¶ 5(v)].

Defendant Harris had no other involvement in getting Plaintiff out of cell S-109, in escorting Plaintiff to the intake cell, in placing Plaintiff on the bed there, or in applying the four-point restraints. [Doc. 35-3 at ¶¶ 7, 8, 9]. Specifically, Defendant Harris did not hit, punch, kick, or use any other force on Plaintiff, nor did Defendant Harris witness any other staff using any force on Plaintiff beyond that which was necessary to escort him to the intake cell and restrain him while the four-point restraints were applied. [Id. at ¶ 12]. Further, any force used on Plaintiff was necessary to achieve a correctional goal and was not excessive. [Id. at ¶ 13; Doc. 35-4 at ¶ 6].

5

Defendant Grindstaff was not present for the application of the restraints, as there were several supervisors on site at the time, including Lieutenant Buchanan, Assistant Unit Manager Mask, Lieutenant Riddle, and Brett Bullis. [Doc. 35-2 at ¶ 5(j)]. Further, Defendant Grindstaff did not witness any staff cursing at or smacking, punching, kneeing, or choking Plaintiff. [Id. at ¶ 5(k)].

Nurse Janet Ray, RN, reported promptly to RHU to check Plaintiff's restraints and to ensure Plaintiff was not in distress. [Doc. 35-1 at 8; Doc. 35-5 at ¶ 5]. This is standard and required procedure when four-point restraints are used. [Doc. 35-5 at ¶ 5]. Nurse Ray reported that Plaintiff had adequate capillary refill to his fingers, and that she was able to get her fingers under the restraints on Plaintiff's wrist and ankles. [Doc. 35-1 at 8; Doc. 35-5 at ¶ 6]. As such, Nurse Ray determined that the four-point restraints were appropriately and safely applied. [Doc. 35-5 at ¶ 6]. Nurse Ray was not informed that there was a use-of-force incident nor did she notice any injuries or marks on Plaintiff. [Id. at ¶ 7]. Further, Plaintiff did not complain to Nurse Ray about any injuries at this time. [Id. at ¶ 7].

At 4:00 p.m., while he was in four-point restraints, Plaintiff was seen by Staff Psychologist Rich Bruner to ensure Plaintiff was calm and of limited danger to attending officers so that Plaintiff could take his scheduled bathroom break. [Doc. 35-7 at 6]. At that time, Plaintiff's safety smock had been returned and Plaintiff seemed to be returning to a calm, lucid state. [Id. at ¶ 19]. Psychologist Bruner noted that Plaintiff "reported recently 'waking up' to find himself [in] 4 point restraints. He states he does not remember actions from this morning which led to his current state." [Id. at 6].

At approximately 5:30 p.m., due to Plaintiff's improved behavior, the four-point restraints were removed. Plaintiff was placed in full mechanical restraints at this time. [Doc. 35-1 at 6; Id.

6

at 37]. At 7:30 p.m., due to continued improved behavior, Plaintiff's connecting chain was removed. Then, at 9:30 p.m., Plaintiff's leg restraints were removed. At 11:30 p.m., Plaintiff's waist chain and block box were removed. Finally, on April 20, 2018, at 1:00 a.m., Plaintiff's handcuffs were removed. [Doc. 35-1 at 6].

Defendant Slater saw Plaintiff the next morning, April 20, 2018, at approximately 9:00 a.m. [Doc. 35-7 at ¶ 20]. Plaintiff was in his cell, out of restraints, and had his safety apron, blanket, and mattress. At this visit, Plaintiff stated to Defendant Slater, "I really had a bad day yesterday." Plaintiff also apologized to Defendant Slater "if I was rude." [Id. at 5]. Plaintiff remained on SIB precautions until April 22, 2018. [Id.; id. at ¶ 21]. Plaintiff did not return to SIB precautions during the remainder of his incarceration at Mountain View. [Id. at ¶ 21].

Plaintiff had several other medical and mental health encounters in the days following the alleged incident. Plaintiff, however, did not complain of or even mention the alleged use of excessive force or any injuries therefrom until eight days later.

On April 20, 2018, at approximately 11 p.m., Plaintiff was seen by Nurse Deborah Huskins, RN, for a hunger strike assessment. Plaintiff was on day five of his hunger strike. [Doc. 35-5 at 16]. Plaintiff allowed his vital signs to be taken and a urine dipstick to be done, but he refused a blood check. [Id.]. The urine dipstick results showed indications of dehydration. [Id. at 17]. Plaintiff initially agreed to go to local emergency room for further assessment and treatment, but then refused to go. Plaintiff stated he just wants to see a dietician and a mental health provider again. [Id.]. Plaintiff, however, made no complaints regarding any alleged use of excessive force during this encounter. [See id. at 16].

On April 21, 2018, at around 9:00 a.m., Plaintiff was seen in RHU by Nurse Lora Winegar, RN. Nurse Winegar encouraged Plaintiff to go to the hospital for IV fluids and/or to end his hunger

7

strike. [Doc. 35-5 at 12]. Plaintiff refused and stated:

> I'm on a hunger strike because I want treatment by mental health. I wanted to be admitted to the mental health floor and get my medications back. I was on Thorazine and Clozapine before and my order expired and it was never renewed. When I go without these medications I black out. The other day I blacked out and woke up in 4 point restraints. I am afraid that I am going to black out and never wake up. I know it is not good to go without eating and drinking but I have to do this to get my treatment. I am willing to do whatever I have to do to get this mental health treatment.

[Id.]. Nurse Winegar noted that "[n]o records were found of the inmate being one either one of these medications." [Id.]. Plaintiff made no complaints regarding any alleged use of excessive force during this encounter. [See Doc. 35-5].

Later that day, at 5:45 p.m., Nurse Tommy Hughes, RN, assessed the Plaintiff in RHU. Plaintiff complaint of stomach pain and cramps. Plaintiff stated that he drank about three cups of water earlier that day. All Plaintiff's vital signs were within normal limits and no acute distress was noted. [Id. at 11]. Again, Plaintiff made no complaints regarding any alleged use of excessive force during this encounter. [See id. at 11].

On or around April 22, 2018, Plaintiff ended his hunger strike and resumed eating. [Doc. 35-5 at 10]. On April 25, 2018, at approximately 9:00 a.m., Plaintiff was examined by P.A. Patane secondary to the end of Plaintiff's most recent hunger strike. Plaintiff had no complaints or symptoms relative to his hunger strike. [Id. at 7]. And, again, Plaintiff made no complaints regarding any alleged use of excessive force during this encounter. [See id. at 7].

Finally, on April 28, 2018, Plaintiff was seen my medical staff in response to a grievance he had filed. At this visit, Plaintiff complained to Nurse Tamara Allen, RN, that, on April 19, 2018, "while being placed in restraints that staff kicked, punched and beat him in the head. [Plaintiff] states that his neck and lower back are hurt and now causing him pain." [Id. at 4]. Nurse

8

Allen examined Plaintiff from head to toe and noted no injuries. Nurse Allen also noted that Plaintiff "has full range of motion to all extremities with no deformity or visible injuries." [Id.].

### 2. Plaintiff's Summary Judgment Materials

In opposition to Defendants' summary judgment motion, Plaintiff has submitted a brief, his own sworn declaration and various exhibits thereto, including prison records, prison policies, medical records, sick call appointment requests, Defendants' discovery responses, and a list of "Case law in support of Plaintiffs [*sic*] Response."[1] [Docs. 41, 41-1 through 41-17]. Plaintiff's forecast of evidence shows, in pertinent part, as follows:[2]

On April 13, 2018, Plaintiff was transferred to Mountain View and placed in cell N-212. [Doc. 41-3 at 2: "Affidavit"]. Plaintiff began to have a panic attack and heard voices. Plaintiff notified a staff member that he was having thoughts of harming himself. The staff member closed the slider on Plaintiff's cell window and walked away. Plaintiff then began to kick his cell door until Lieutenant Buchanan came to Plaintiff's cell. [Id.]. Lieutenant Buchanan returned with several other staff members and a mental health provider. Plaintiff was transferred to cell S-111 and placed on suicide precautions. [Id.]. At some point thereafter but before April 15, 2018, Plaintiff was taken off suicide precautions. [See id. at 2].

On April 15, 2018, at 5:30 p.m., Plaintiff reported to the officer in charge that he had come off suicide precautions "too soon" and did not feel safe with himself. Plaintiff was then placed

---

[1] Plaintiff also submits an "Addendum" with his summary judgment materials in which he alleges additional adverse conditions of confinement. [Doc. 41-3 at 7-8]. The Court will not consider this Addendum, as these additional allegations were not included in Plaintiff's original Complaint and do not relate to the transactions or occurrences that were put at issue in Plaintiff's original Complaint. Further, these allegations are not made against any particular individual, in any event, and do not even reference the Defendants in this matter.

[2] In the interest of efficiency, the Court does not include Plaintiff's forecast of evidence that does not conflict with Defendants' forecast in any meaingful way.

9

back on suicide precautions. [Doc. 41-12 at 2]. In a Self-Injury Risk Assessment interview with Psychologist Bruner, Plaintiff reported "that his life was filled with taking advantage of and hurting other people and he would probably just do that again so he ought to just stay where he was and die." [Id.]. Mr. Bruner noted that Plaintiff "appeared sad and sincere when discussing his feelings of hopelessness and helplessness." [Id.].

On April 16, 2018, while still on suicide precautions, Plaintiff began a hunger strike after he noticed hair and foreign objects in his food. [Doc. 41-3 at 2]. On April 19, 2018, Defendant Slater came to Plaintiff's cell to talk to Plaintiff, but Plaintiff refused. Defendant Slater eventually became more frustrated and advised staff to remove Plaintiff's safety smock. [Id.]. Plaintiff continued to refuse to talk to Defendant Slater and she then ordered the removal of Plaintiff's safety blanket. Finally, after again refusing to speak with Defendant Slater, she ordered the removal of Plaintiff's safety mattress. [Id. at 2-3]. Defendant Slater ordered the staff to "leave him naked and don't give him anything back." [Doc. 41-7: Michael A. York Affidavit]. Plaintiff was left in cell S-111 completely naked. [Doc. 41-3 at 3].

Sometime later, Plaintiff was moved to cell S-109 by Defendant Riddle, Lieutenant Buchanan, and another officer after Plaintiff eventually agreed to submit to handcuffs after being threatened with mace and given a pair of boxer shorts for the transfer. [Id.]. Cell S-109 was filthy, as it had not been cleaned since being vacated by the previous occupant. [Doc. 41-1 at 2: Plaintiff's Declaration; Doc. 41-3 at 3]. Plaintiff was stripped of his boxer shorts and again left naked. [Doc. 41-3 at 3]. Shortly thereafter, Plaintiff filed a P.R.E.A. complaint[3] against Defendant Riddle.

---

[3] P.R.E.A. stands for the Prison Rape Elimination Act, 34 U.S.C. § 30301. It seeks to establish "zero tolerance" for the incidence of prison rape. The purpose of this Act is to protect inmates in correctional facilities from sexual abuse and sexual assault. Gadeson v. Reynolds, No. 2:08-3702-CMC-RSC, 2009 WL 4572872, at *3 (D.S.C. Dec. 4, 2009).

Plaintiff met with Brett Bullis, the Mountain View P.R.E.A. representative, between 11:15 a.m. and 11:30 a.m., while still completely naked. [Id.].

After Mr. Bullis left Plaintiff's cell, Plaintiff began hearing voices that encouraged Plaintiff to hurt someone. Plaintiff tried to ask for help, but he was instead told over the intercom "just kill yourself nigger!" [Doc. 41-3 at 3]. By 1:00 p.m., Plaintiff had been left naked, "cold visibly trembling" in this filthy cell for over four hours. [Doc. 41-1 at 2]. Around this time, Lieutenant Buchanan, Assistant Unit Manager Mask, and several other officers, sergeants, and lieutenants came to Plaintiff's cells and tried to give Plaintiff his SIB smock, stating "she shouldn't [have] left you naked." [Doc. 41-1 at 3; Doc. 41-3 at 4]. "Not being of sound mind and body at the time" and "in a frenzy of paranoid thoughts," Plaintiff refused. [Id. at 3; Doc. 41-3 at 4].

Defendant Grindstaff then stepped forward and threatened to mace Plaintiff if Plaintiff did not submit to handcuffs. [Doc. 41-3 at 4; Doc. 41-1 at 3]. Plaintiff submitted to handcuffs and was "violently snatched out of [his] cell backwards." [Doc. 41-1 at 3; see Doc. 41-3 at 4; see Doc. 41-7]. Plaintiff was forced into a smock by two officers. [Id. at 3]. Defendant Grindstaff then stated, "Put his ass in 4 pt. restraints!" [Doc. 41-3 at 4]. Plaintiff was then taken to a "camera[-]less holding cell," "while begging staff to follow policy and please go retrieve a video camera," "where [he] was punched repeatedly in the left side of [his] head by Defendant Harris while being kicked and hit by other staff [Plaintiff] could not name. Defendant Harris then placed both hands around [Plaintiff's] neck and gradually applied pressure until [Plaintiff] lost conciousness [*sic*]." [Doc. 41-1 at 3-4; Doc. 41-3 at 4; see Doc. 41-7]. At some point, Plaintiff was lifted off the ground completely and slammed into the steel bed frame. [Doc. 41-3 at 4]. This all occurred in the presence of Defendant Girndstaff. [Id.]. Plaintiff recalls waking up in four-point restraints sometime later and speaking with Psychologist Bruner. [Doc. 41-1 at 4]. Lieutenant Buchanan

then "hurried to have [Plaintiff] taken out of the 4[-]point restraints befor [*sic*] shift change." [Doc. 41-3]. After being out the restraints, Plaintiff had a steady pounding in his ear and noticed dry and crusted blood inside his ear. [Id. at 4].

On April 20, 2018, between 8:00 a.m. and 9:00 a.m., Plaintiff was returned to his cell. [Id.]. Later that day, Plaintiff was told by Mr. Bruner that Plaintiff would not be taken off SIB precautions until he ended his hunger strike. Plaintiff eventually relented and ended his hunger strike. [Id. at 5]. On April 24, 2018, Plaintiff was taken off suicide precautions and moved back to cell N-212. [Id.].

On April 27, 2018, Plaintiff filed a grievance related to the alleged events around the application of the four-point restraints. The next day Plaintiff was seen by medical staff and informed them of his neck and ear issues. [Id.]. Plaintiff does not include a copy of this grievance in his summary judgment materials. On June 5, 2018, just days before filing the Complaint in this matter, Plaintiff submitted a five-page grievance regarding the incident [Doc. 41-8 at 2-6], which the Court can only assume is at least somewhat duplicative of the grievance Plaintiff alleges he filed on April 27, 2018.

Plaintiff also submits medical records for care he received after the incident at issue. On October 23, 2018, approximately six months after the incident, Plaintiff reported in a Sick Call Appointment Request "over the last couple months hearing in my left ear has slowly diminished and I now have almost no hearing at all in my left ear." [Doc. 41-10 at 7]. On December 3, 2018, Plaintiff was seen by Nurse Pamela Cox, RN, for his hearing loss. Nurse Cox noted that she had to speak with Plaintiff "face to face" so that he could hear her properly. [Doc. 41-11 at 2]. Physical examination showed a "pearly and bulging" ear drum. [Id.]. Plaintiff was prescribed Claritin, an allergy medication, and medicated nasal spray to treat his ear. [See Doc. 41-9 at 2, 4]. On January

26, 2019, Plaintiff reports to Nurse Rowel Dauz, RN, that he "ha[s] no hearing still on [his] left ear." [Id. at 7]. Plaintiff was seen on January 28, 2019 by Nurse Annetta Ratliff, LPN, for follow up on his hearing loss. Plaintiff also reported sporadic pain in his left ear at this time. [Doc. 41-11 at 4]. Nurse Ratliff noted that the Claritin and nasal spray had been ineffective to treat Plaintiff's hearing loss. [Id.]. On January 30, 2019, a note was added to Plaintiff's medical chart indicating that Plaintiff stated that he was going to start a hunger strike if he did not get audiology testing. [Id. at 6].

Plaintiff also submits evidence regarding the lack of video footage of the alleged use of force incident. Specifically, Plaintiff submits that, at the final stage of administrative review of the incident, Facility Administrator M. Slagle found as follows:

> Based on this review it appears that appropriate action was taken in response to the inmate's inappropriate actions. All policies and procedures are thoroughly documented by the reviewing authority. Although I understand and agree with the lack of video footage for the initial response to the inmates SIB, I do think there was time to retrieve a camera to video the placement in restraints. In the future uninvolved staff should be utilized to retrieve a camera and as much of the incident as possible should be videoed for documentation purposes. This should be addressed with responsible staff.

[Doc. 41-4 at 3]. Plaintiff also submits the prison policy which provides that, "when use of force is anticipated, the responsible supervisor will implement the use of the audio/video camera procedures," which "encompasses the actual filming of incidents where correctional staff anticipates the use of physical force." [Doc. 41-6 at 18].

Neither party submitted any video footage of any alleged event in this matter. Further, there is no evidence in the record of any discovery dispute between the parties regarding the production of any video footage. Defendants maintain that there is no footage of the events in this case. [Doc. 41-16 at 3]. In his original Complaint, Plaintiff alleges that his constitutional rights

13

were violated by Defendant Riddle's and Defendant Grindstaff's failure to ensure that the application of full restraints was videotaped.[4]  [Doc. 1 at 5, 6].

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

---

[4] Plaintiff, however, cites to no authority creating a constitutionally protected right to have anticipated use of force incidents videotaped and the Court is aware of none.  Therefore, while it appears the failure to videotape the application of four-point restraints may have violated prison policy, the Court declines to further address this claim by Plaintiff.

14

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007).

## III. DISCUSSION

### A. Excessive Force.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312, 319 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

When an inmate claims that prison officials used excessive force on him, he must meet a higher standard to establish the subjective standard. This is because prison "[o]fficials are entitled to use appropriate force to quell prison disturbances." Williams, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous." Id. (citing Whitley, 475 U.S. at 320). "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm." Id. (internal quotations and citation omitted).

Plaintiff attests that Defendant Harris (and other unnamed staff) gratuitously beat him and that Defendant Harris choked Plaintiff until Plaintiff passed out. Plaintiff's version of events, however, is wholly contradicted by the record. Most compelling is that Plaintiff was seen and/or examined by medical and mental health providers at least five times after the alleged use of excessive force before finally claiming, on April 27, 2018, that he had been beaten. Examination of Plaintiff on April 28, 2018 showed no evidence of injury. Further, immediately after the four-point restraints had been applied, Plaintiff was assessed by Defendant Slater. She observed no injuries and noted that the four-point restraints had been applied properly. Finally, while Plaintiff was still in the four-point restraints, he told Psychologist Bruner that he had recently woken up to find himself in the restraints and could not remember what led to the application of the restraints.

Here, Plaintiff's story is wholly contradicted by the record, such that no reasonable juror could believe it.[5] Scott, 550 U.S. at 380, 127 S. Ct. at 1776. The Court, therefore, should not adopt it for the purpose of ruling on Defendants' summary judgment motion.

---

[5] Interestingly, it appears Plaintiff is attempting to connect his hearing loss in his left ear to the incident in question. The medical records are clear, however, that Plaintiff's symptoms did not begin until four months after the incident and were treated as consistent with an ear infection. Accordingly, the fact of Plaintiff's hearing loss does not make his story any more believable.

The Plaintiff's forecast of evidence, therefore, creates no genuine issue of material fact relevant to whether Defendant Harris used excessive force against the Plaintiff. The Court will grant summary judgment on Plaintiff's claim of use of excessive force against Defendant Harris.

**B. Failure to Intervene.**

Next, the Court examines Plaintiff's claims against Defendants Riddle and Grindstaff based on their alleged failure to intervene in the attacks on Plaintiff. Plaintiff contends that Defendants Riddle and Grindstaff allowed staff, including Defendant Harris, to punch, hit, smack, body slam, and choke Plaintiff until Plaintiff lost consciousness and blacked out.

The negligent failure to protect an inmate from assaults by other prisoners, or by other prison guards, does not rise to the level of an unconstitutional violation. Davidson v. Cannon, 474 U.S. 344, 348 (1986). To show deliberate indifference, a plaintiff must allege that the prison official had actual knowledge of an excessive risk to the plaintiff's safety. Danser v. Stansberry, No. 13-1828, 2014 WL 2978541, at *5 (4th Cir. Sept. 12, 2014). In other words, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Further, a plaintiff sufficiently alleges a failure to intervene by a prison official where the plaintiff states that the official observed an altercation and failed to respond. Brown v. N.C. Dept. of Corrections, 612 F.3d 720, 723 (4th Cir. 2010).

Here, because no reasonable juror could believe Plaintiff's version of the facts relative to the alleged use of excessive force, which is contradicted by the record as a whole, the claims against Defendants Riddle and Grindstaff necessarily fail. There can be no failure to intervene in an attack that no reasonable juror could believe occurred in the first place. As such, the Court will grant the motions for summary judgment by Defendants Riddle and Grindstaff.

## C. Conditions of Confinement.

The Eighth Amendment also protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). "Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment prohibition against cruel and unusual punishment." Dixon v. Godinez, 114 F.3d 640, 642 (7th Cir. 1997). Rather, extreme deprivations are required, and "only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation omitted)). The plaintiff must allege facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 847 (1994). A plaintiff must also generally allege "a serious or significant physical or emotional injury resulting from the challenged conditions." Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993). To show an extreme deprivation, a prisoner "must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," Strickler v. Waters, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions, see Helling v. McKinney, 509 U.S. 25, 33-35 (1993).

Defendants' forecast of evidence shows that the challenged conditions were engaged in accordance with prison policy and were necessary to ensure the safety of Plaintiff and others. Defendants' forecast of evidence also shows that any deprivation Plaintiff suffered was minimal and short-lived. Namely, Plaintiff's safety smock, blanket, and mattress were removed for a period of approximately five hours before four-point restraints were applied to Plaintiff for the purpose

of protecting Plaintiff's safety. Further, sometime shortly thereafter, Plaintiff's safety smock was returned to him.

Plaintiff's forecast of evidence does not create a genuine issue of material fact on this issue. Plaintiff has not shown an extreme deprivation, that prison officials knew of and disregarded a substantial risk of serious harm to Plaintiff, or that Plaintiff suffered any actual physical or emotional harm as a result of his conditions. Plaintiff has shown only that the cell he was moved to, cell S-109, was filthy, that Plaintiff was left naked in that cell for approximately five hours, and that he was cold during that time. Further, Plaintiff admits that several individuals attempted to return his safety smock to him, and that he refused to accept it.

Plaintiff, therefore, has failed to forecast sufficient evidence to overcome Defendants' showing that Plaintiff was not subjected to unconstitutional conditions of confinement.

Finally, Defendants also seek summary judgment based on qualified immunity. [Doc. 33]. Qualified immunity shields "government officials performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Defendants, therefore, are entitled to qualified immunity if either their conduct did not violate any constitutional rights, or the right was not clearly established. Pearson v. Callahan, 555 U.S. 223, 232 (2009). Here, Plaintiff has failed to forecast sufficient evidence that Defendants' conduct violated any constitutional rights. As such, Defendants are also entitled to qualified immunity.

In sum, for the reasons stated herein, Defendants' motion for summary judgment is granted.

## IV. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' motion for summary

judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment [Doc. 33] is **GRANTED**.

2. Plaintiff's Motion for Copies [Doc. 42] is **DENIED** as moot.

3. The Clerk is instructed to terminate this action.

Signed: January 8, 2020

Frank D. Whitney
Chief United States District Judge